UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KASEY A. BERNOLA, | ) | 3:14CV1405 |
| | ) | |
| Plaintiff | ) | |
| | ) | JUDGE JAMES G. CARR |
| v. | ) | (Mag. Judge Kenneth S. McHargh) |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| | ) | |
| Defendant | ) | REPORT AND |
| | ) | <u>RECOMMENDATION</u> |

McHARGH, MAG. JUDGE

This case is before the Magistrate Judge pursuant to Local Rule.  The issue before the court is whether the final decision of the Commissioner of Social Security ("the Commissioner") denying Plaintiff Kasey Bernola's application for Social Security Disability and Supplemental Security Income benefits under Title II and XVI of the Social Security Act, 42 U.S.C § 1381 et seq., is supported by substantial evidence and, therefore, conclusive.

I.  PROCEDURAL HISTORY

On January 3, 2011, Plaintiff Kasey A. Bernola ("Bernola") applied for Disability Insurance and SSI benefits.[1]  (Doc. 13, tr., at 226, 228.)  Bernola stated

---

[1] In her decision, the ALJ noted that the record contained an unfavorable decision from a prior ALJ, in 2008.  *See generally* doc. 13, tr., at 66-81.  However, the ALJ

that she became unable to work because of her disabling condition on August 5, 2008. (Tr., at 226, 228, 258.) Bernola listed her physical or mental conditions that limit her ability to work as "left knee; schizophrenia w/psychotic episodes; PTSD; panic attacks; anxiety; bi polar with both manic depressive and manic episodes; lower back pain." (Tr., at 258.)

Bernola was notified that she did not have sufficient work history to be eligible for Disability Insurance benefits, and that finding was not timely appealed, nor is it challenged here. (Doc. 14, at 2; doc. 13, tr., at 119.)

Bernola's SSI application was denied initially and upon reconsideration. (Tr., at 123-125, 133-135.) On March 30, 2012, Bernola filed a written request for a hearing before an administrative law judge. (Tr., at 140-141.)

An Administrative Law Judge ("the ALJ") convened a video hearing on November 2, 2012, to hear Bernola's case. (Tr., at 37-64.) Bernola was represented by counsel at the hearing. (Tr., at 39.) Charles H. McBee, a vocational expert, attended the hearing and provided testimony. (Tr., at 56-62.)

On November 16, 2012, the ALJ issued her decision applying the standard five-step sequential analysis[2] to determine whether Bernola was disabled. (Tr., at

---

stated that Bernola's condition had changed since the prior decision, thus she was not bound to adopt the previous RFC finding. (Tr., at 17-18.)

[2] Social Security Administration regulations require an ALJ to follow a five-step sequential analysis in making a determination as to "disability." *See* 20 C.F.R. §§ 404.1520(a), 416.920(a); *Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6th Cir. 2001). The Sixth Circuit has outlined the five steps as follows:

14-25.)  Based on her review, the ALJ concluded Bernola was not disabled.  (Tr., at 17, 25.)

The Appeals Council denied Bernola's request for review, thus rendering the ALJ's decision the final decision of the Commissioner.  (Tr., at 1-3.)  Bernola now seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C. §§ 405(g) and 1383(c).

Bernola briefs two issues for review:

1.  Did the ALJ produce reversible error by refusing to grant the greatest weight to the sole longitudinal mental health source of record?

---

First, the claimant must demonstrate that he has not engaged in substantial gainful activity during the period of disability. 20 C.F.R. § 404.1520(a)(4)(I). Second, the claimant must show that he suffers from a severe medically determinable physical or mental impairment. Id. § 404.1520(a)(4)(ii).  Third, if the claimant shows that his impairment meets or medically equals one of the impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1, he is deemed disabled.  Id. § 404.1520(a)(4)(iii).  Fourth, the ALJ determines whether, based on the claimant's residual functional capacity, the claimant can perform his past relevant work, in which case the claimant is not disabled.  Id. § 404.1520(a)(4)(iv).  Fifth, the ALJ determines whether, based on the claimant's residual functional capacity, as well as his age, education, and work experience, the claimant can make an adjustment to other work, in which case the claimant is not disabled.  Id. § 404.1520(a)(4)(v).

The claimant bears the burden of proof during the first four steps, but the burden shifts to the Commissioner at step five. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir.1997).

*Wilson  v. Commissioner of Social Security*, 378 F.3d 541, 548 (6th Cir. 2004).

2. Was the ALJ's evaluation of the treating mental health source procedurally deficient so as to leave that determination not supported by the weight of substantial evidence?

(Doc. 14, at 2.)

## II. PERSONAL BACKGROUND INFORMATION

Bernola was born on June 8, 1963, and was 47 years old as of her alleged disability onset date. (Doc. 13, tr., at 30, 226, 228.) Accordingly, Bernola was at all times considered a "younger person" for Social Security purposes. See 20 C.F.R. §§ 404.1563(c), 416.963(c). Bernola graduated from high school, attended two years of college, and is able to communicate in English. (Tr., at 30, 257, 259.) She has no past relevant work. (Tr., at 29, 57.)

## III. MEDICAL EVIDENCE[3]

Disputed issues will be discussed as they arise in Bernola's brief alleging errors by the ALJ. A short summary of relevant medical history follows here. As noted earlier, Bernola applied for SSI benefits on January 3, 2011. (Doc. 13, tr., at 228.) Bernola had listed the conditions that limit her ability to work as "left knee; schizophrenia w/psychotic episodes; PTSD; panic attacks; anxiety; bi polar with both manic depressive and manic episodes; lower back pain." (Tr., at 258.)

---

[3] The following is merely a summary of the medical evidence relevant to the undersigned's decision. It is not intended to fully reflect all of the evidence the undersigned took into consideration.

4

Upon referral from the Ohio Bureau of Disability Determination, psychologist Alan White, Ph.D., performed a clinical interview for a psychological examination on January 5, 2010.  (Tr., at 364-369.)  Dr. White found that Bernola's mental abilities were not impaired in three areas:  1) ability to relate to others, including fellow workers and supervisors; 2) ability to understand, remember, and follow instructions; and 3) ability to maintain attention, concentration, persistence and pace to perform routine tasks.  However, he found her mental ability to withstand the stress and pressures associated with day-to-day work activities was moderately impaired due to bipolar disorder and PTSD.  (Tr., at 369.)

On January 14, 2010, Kristen Haskins, Psy.D., completed a psychiatric review assessment.  (Tr., at 372-385.)  Dr. Haskins noted bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes.  (Tr., at 375.)  She also noted the anxiety-related disorder of PTSD.  (Tr., at 377.)  Dr. Haskins determined that Bernola did not have functional limitations such as restriction of daily living activities, or difficulties in maintaining social functioning.  She also found no episodes of decompensation. However, she noted moderate difficulties in maintaining concentration, persistence or pace.  (Tr., at 382.)

Bernola's relevant application for SSI benefits was filed on January 3, 2011. (Doc. 13, tr., at 228.)

Bernola points outs that she received treatment for her mental health issues before and throughout the time period at issue in her claim for SSI benefits from

psychiatrist Jatinder Rana.  (Doc. 14, at 3-5.)  At a January 27, 2011, appointment, Dr. Rana's psychiatric progress note stated that Bernola was taking her medications as prescribed, and was doing well on them.  Her mood was described as stable.  She complained of some difficulty sleeping at night.  She "still hears voices, but they aren't intrusive or intense."  (Tr., at 500.)

At an April 7, 2011, appointment, Bernola reported that she was not doing well.  She said she was "snappy" and "irritable," although the doctor reported her to be "pleasant to interact with," and characterized her behavior as cooperative and compliant.  Bernola also reported she hadn't been able to sleep, and that she had a hard time shutting off her mind.  She complained she had been having flashbacks of her 2008 accident[4], and she gets scared when she has to go out.  (Tr., at 499.)

The following month, at a May 26 appointment, Bernola reported she was doing fairly well, that she was less snappy and irritable.  "The only problem she sees is that she still has a hard time going to bed at night;" her mind raced much more at that time.  Seroquel was added to her medications.  (Tr., at 498.)  At a September 1, 2011, follow-up, Bernola reported she was doing fairly well.  She had no hallucinations, she doesn't see ghosts or hear voices, and she was much calmer.  She reported that she could sleep at night.  Dr. Rana decreased her Invega, but kept her Lamictal and Seroquel the same.  (Tr., at 497.)

---

[4] At the hearing, Bernola testified that her left leg had been run over by a truck, and was still problematic.  (Tr., at 49.)

6

There was subsequently a regression in Bernola's condition.  At the October 20, 2011, visit, Bernola reported that she didn't do well with the decrease in her Invega dosage.  She reported having hallucinations, hearing voices and seeing things.  "She believes that somebody is behind her.  She's seeing ghosts and is more paranoid."  Dr. Rana noted that Bernola had tolerated the previous (higher) dosage of Invega well, other than some hand tremors, and her hallucinations and psychosis had been well-controlled.  The doctor increased her Invega dosage to the previous amount, and instructed Bernola to watch for any side effects.  (Tr., at 496.)

At the next visit, November 17, 2011, Bernola reported that she had another incident where she heard a voice quite clearly.  She stated that seeing things had decreased, but she still was hearing voices and feeling paranoid.  (Tr.,at 495.) Bernola reported on January 5, 2012, that the voices had decreased, but that she sees black shadows, floating in the air, or on the floor, and that "sometimes she gets quite scared with the shadows."  The doctor noted she was fully compliant with her medications.  (Tr., at 494.)

Dr. Rana stated that Bernola "seems to be improving," at a February 2,2012, visit.  Bernola stated that she wasn't hearing many voices, and they weren't as prominent.  She still sees shadows and has visions.  Bernola was fully compliant with her medications, and seemed to be tolerating them well.  (Tr., at 493.)  At an appointment the following month, Bernola stated she had fewer hallucinations, but continued to have paranoia, especially when she was out in the open, with a lot of

7

people around her. Dr. Rana noted that her paranoia increased her anxiety, but that her visual and auditory hallucinations were less prominent. (Tr., at 492.)

At an April 26, 2012, visit, Bernola stated she still had hallucinations, but they were not as strong, and she still had paranoia, which was also not too severe. Bernola said that she was able to handle her hallucinations as well as the paranoia. She continued to have some nightmares and flashbacks of her accident, and whenever she saw a big truck, it made her very anxious and nervous. Bernola was tolerating her medications well, although she had noticed some new tremors off and on. Dr. Rana decreased her Invega prescription slightly. (Tr., at 491.)

However, at her May 31, 2012 visit, Bernola reported that she hadn't done well with decrease in her medications. Her visual hallucinations were coming back, as well as her auditory ones. She was seeing shadows and faces, which she feels are talking to her, which at times makes her quite scared. Dr. Rana noted that the decrease in medications improved her tremors, but her psychotic symptoms were increasing. Dr. Rana increased her Invega to the previous prescription, as Bernola did quite well with that. (Tr., at 490.)

On August 23, 2012, Bernola stated she didn't seem paranoid, and it seemed like things were under control. Her auditory hallucinations were under control, although she still saw shadows and faces, but much less prominent. Bernola mentioned some tremors in her hands. (Tr., at 513.)

Dr. Rana twice provided medical opinions concerning Bernola's mental residual functional capacity. The first, completed on October 28, 2010, assessed

8

Bernola to be "markedly limited" in twelve of the twenty categories, and "moderately limited" in the remaining eight.  Dr. Rana opined that Bernola was "unemployable," and that her limitations were expected to last twelve months or more. (Tr., at 461.)

The second mental RFC was completed by Dr. Rana two years later, on October 18, 2012.  (Tr., at 517-521.)  Dr. Rana evaluated Bernola with Bipolar II Disorder; PTSD; Personality Disorder, NOS; and Psychosis, NOS.  Dr. Rana described the prognosis as "guarded."  (Tr., at 517.)

Dr. Rana determined that, based upon all of Bernola's physical and mental limitations taken in combination, Bernola would be precluded from performing a job, or off-task, 5% or less of an 8-hour workday.  (Tr., at 517.)  At the same time, Dr. Rana marked that Bernola would be unable to obtain and retain full-time work in a competitive work setting.  Dr. Rana noted that Bernola's current GAF was 55, and that she had cognitive deficits secondary to chronic mental illness.  (Tr., at 518.)

Filling out a grid[5], Dr. Rana found that Bernola's mental abilities would allow her to perform the following tasks for 15% or more of an 8-hour work day: Remember location and work-like procedures; understand, remember and carry out very short and simple instructions; and, make simple work-related decisions. Bernola would be able to understand and remember detailed instructions for 10% of the work day.  Bernola could perform the following tasks for 5% of the work day: Carry out detailed instructions; maintain attention and concentration for extended periods of time; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and work week without interruptions from psychologically based symptoms; and, perform at a consistent pace without an unreasonable number or length of rest periods.  (Tr., at 519.)

Dr. Rana found it was likely that Bernola would likely be unable to complete an 8-hour work day as a result of her impairment more than four days per month,

---

[5] The ALJ believed that the column headings in the grid were "cut off."  For example,

> "Category II states, 'able to perform for 5% of an 8-hour work day.'  It is likely supposed to state, 'unable to perform' consistent with the prior instructions on page one.  It appears Dr. Rana mistook the instructions and read them as written."  (Tr., at 29.)

While the ALJ may indeed be correct in her supposition, the court will not attempt to hazard a guess as to Dr. Rana's understanding, and will simply present what Dr. Rana indicated, as it appears in the record.

10

on average.  The doctor indicated that Bernola could be expected to perform less than 50% as efficiently as an average worker.  (Tr., at 520.)

## IV.  TESTIMONY OF VOCATIONAL EXPERT

At the hearing, the vocational expert McBee provided testimony.  (Doc. 13, tr., at 56-62.)  The ALJ found that Bernola had no past relevant work.  (Tr., at 57.)

The ALJ posed a hypothetical question concerning an individual with Bernola's vocational situation, who could perform all the functions of light work, except no operating of left foot controls, occasional climbing of stairs, and no climbing of  ladders and the like.  Rare (meaning less than occasionally but not completely precluded) kneeling, crouching or crawling; frequently handling and fingering; occasional exposure to obvious hazards; work with an SVP 1 or 2, where the pace and productivity is not dictated by an external source over which the individual has no control, such as an assembly line or conveyor belt; work that is repetitive from day to day with expected changes; no contact with the general public; and occasional contact with coworkers.  The question was:  Is there work that such a hypothetical person would be able to perform?  (Doc. 13, tr., at 57-58.)

The VE answered that, based upon the hypothetical limitations, that person would have the capacity to perform work such as a shipping and receiving weigher, DOT code 222.387-074, at the light exertional level, SVP 2.  In Ohio, there are at least 1,200 jobs, and in the national economy, at least 50,000.  Another job would be photocopy machine operator, DOT 207.685-014, light exertional level, SVP 2.  In

11

Ohio, 2,000 such jobs, and nationally at least 90,000.  Thirdly, folder of laundry products, DOT 369-687-018, light exertional level, SVP 2.  In Ohio, there are at least 1,500 such jobs, and nationally at least 75,000.  (Tr., at 58.)

The ALJ then modified the hypothetical slightly, changing the lifting limitation to ten pounds, occasionally.  (Tr., at 58.)  McBee responded that these occupations can be performed in the same numbers, even though the light exertional level is up to twenty pounds.  The VE pointed out that these occupations are performed where an individual is only lifting one or two items, which is ten pounds or less.  (Tr., at 59.)

The ALJ's third hypothetical returned to the original limitations, adding work that could be done in a seated or standing position, with no exposure to obvious hazards.  Again, the VE responded that the occupations above could be performed under that hypothetical.  McBee noted that the DOT does not address a sit/stand option, so he was basing his opinion upon his experience and education, etc.

The fourth hypothetical posed by the ALJ "kept everything else the same, including the sit/stand option," but changed to the sedentary level.  (Tr., at 59.) The VE responded that, at the sedentary level, the hypothetical person would have the capacity to perform such jobs as 1) a hand mounter of photos and frames, DOT 976.684-018, sedentary, SVP 2, which in Ohio accounts for 300 to 350 jobs, and in the national economy, at least 18,000; 2) document preparer, DOT 249.587-018, sedentary, SVP 2, with 14,000 jobs in Ohio, and at least 300,000 nationally; and 3)

12

"a waxer of glass products, automotive," DOT 779.687-038, sedentary, SVP 2, at least 1,500 jobs in Ohio, with 50,000 in the national economy.  (Tr., at 59-60.)

The ALJ then was informed by the vocational expert, in response to her inquiries, that ordinary breaks in the course of a workday include a 30-minute lunch, in addition to two 15-minute breaks, one each in the morning and afternoon. In addition, the ALJ was told that the ordinary tolerance for absenteeism was one day per month (beyond any normal sick time or vacation time).  In addition, a worker is ordinarily expected to be "on task" for at least 80% of the workday.  (Tr., at 60.)  The ALJ also asked if there was "allowance to lie down in the course of a workday," to which McBee responded in the negative.  (Tr., at 61.)

Counsel for Bernola then posed a [fifth] hypothetical concerning an individual who has the "ability to perform efficiently" (i.e., carry out detailed instructions, perform within a schedule, maintain attendance and punctuality) five percent of an eight hour workday.  That person would have the ability, again only five percent of the day, to work in coordination with, or in proximity to, others without being distracted by them, or distracting them; and, to complete a normal workday "without interruption from psychologically based symptoms."  (Tr., at 61-62.)  The vocational expert testified that there would not be any work on a sustained basis for such a hypothetical individual.  (Tr., at 62.)

13

## V.  ALJ's DECISION

The ALJ made the following findings of fact and conclusions of law in her

January 9, 2013, decision:

> 1.  The claimant has not engaged in substantial gainful activity since November 3, 2010, the application date (20 CFR 416.971 et seq.).

> 2.  The claimant has the following severe impairments:  degenerative joint disease of the lumbar spine; status post October 2005 fracture of the coccyx; healed fracture of the left knee; bipolar disorder (previously diagnosed as depressive disorder); personality disorder; and posttraumatic stress disorder (20 CFR 416.920(c)).

> 3.  The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

> 4.  After careful consideration of the entire record, the undersigned finds the claimant has the residual functional capacity to perform light work as defined in 20 CFR 416.967(b), except:  no operating of left foot controls; never climb ladders and the like; occasionally climb stairs; rarely (meaning less than occasionally but not completely precluded) kneel, crouch or crawl; frequently handle and finger bilaterally; occasional exposure to obvious hazards; work with an SVP 1 to 2 where the pace of productivity is not dictated by an external source over which the claimant has no control, such as an assembly line or conveyor belt; work that is repetitive from day to day with expected changes; no contact with the general public; and occasional contact with coworkers.

> 5.  The claimant has no past relevant work (20 CFR 416.965).

> 6.  The claimant was born on June 8, 1963, and was 47 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

> 7.  The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

14

8.  Transferability of job skills is not an issue because the claimant does not have past relevant work.  (20 CFR 416.968).

9.  Considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969, and 416.969(a)).

12.  The claimant has not been under a disability, as defined in the Social Security Act, since November 3, 2010, the date the application was filed (20 CFR 416.920(g)).

(Doc. 13, tr., at 20-21, 23, 29-31.)


## VI.  DISABILITY STANDARD

A claimant is entitled to receive Disability Insurance and/or Supplemental Security Income benefits only when she establishes disability within the meaning of the Social Security Act.  See 42 U.S.C. §§ 423, 1381.  A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve (12) months."  See 20 C.F.R. §§ 404.1505, 416.905.


## VII.  STANDARD OF REVIEW

Judicial review of the Commissioner's benefits decision is limited to a determination of whether the ALJ applied the correct legal standards, and whether the findings of the ALJ are supported by substantial evidence.  Blakley v. Comm'r of Social Security, 581 F.3d 399, 405 (6th Cir. 2009); Richardson v. Perales, 402

15

U.S. 389, 401 (1971).  "Substantial evidence" has been defined as more than a scintilla of evidence but less than a preponderance of the evidence.  See Kirk v. Sec'y of Health & Human Servs., 667 F.2d 524, 535 (6th Cir. 1981).  Thus, if the record evidence is of such a nature that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination, that determination must be affirmed.  Id.

The Commissioner's determination must stand if supported by substantial evidence, regardless of whether this court would resolve the issues of fact in dispute differently, or substantial evidence also supports the opposite conclusion.  See Mullen v. Bowen, 800 F.2d 535, 545 (6th Cir. 1986); Kinsella v. Schweiker, 708 F.2d 1058, 1059 (6th Cir. 1983).  This court may not try the case de novo, resolve conflicts in the evidence, or decide questions of credibility.  See Garner v. Heckler, 745 F.2d 383, 387 (6th Cir. 1984).  However, the court may examine all the evidence in the record in making its decision, regardless of whether such evidence was cited in the Commissioner's final decision.  See Walker v. Sec'y of Health & Human Servs., 884 F.2d 241, 245 (6th Cir. 1989).

## VIII.  ANALYSIS

Bernola briefs two issues for review:

1.  Did the ALJ produce reversible error by refusing to grant the greatest weight to the sole longitudinal mental health source of record?

2.  Was the ALJ's evaluation of the treating mental health source
procedurally deficient so as to leave that determination not supported
by the weight of substantial evidence?

(Doc. 14, at 2.)  Both issues are related to the ALJ's assessment of Dr. Rana.

## A.  Treating Source

The first issue raised by Bernola is: "Did the ALJ produce reversible error by
refusing to grant the greatest weight to the sole longitudinal mental health source
of record? "  Bernola contests, in particular, the ALJ's finding which gave "great
weight" to Dr. Rana's October 2012 opinion that Bernola would be off-task no more
than five percent of a work day, and that her GAF was in the moderate range, while
rejecting other limitations as not consistent with Dr. Rana's treatment notes, which
show that she was stable on medications.  (Doc. 14, at 12-13; doc. 13, tr., at 29.)

Bernola contends that the ALJ's finding that Bernola's condition had
stabilized is not supported by substantial evidence.  Bernola argues:

A longitudinal review of Dr. Rana's treatment records would have
demonstrated that Ms. Bernola's symptom severity waxed and waned,
and that periods of relative control came at the cost of undesirable
medication side effects.

(Doc. 14, at 13.)  Bernola asserts that the regulations provide for the need for
longitudinal evidence.  (Doc. 14, at 13, quoting 20 C.F.R. Part 404, Subpt. P, Appx.
1, § 12.00(d)(2).)  Bernola points out that Dr. Rana was the only source of a
longitudinal record for the time period at issue, and argues the ALJ failed to
recognize the nature of that record and the significance of Dr. Rana's opinions and

17

extensive treatment history.  Thus, Bernola claims that the ALJ's denial of
"adjudicative weight" to the treating source was not supported by substantial
evidence.  (Doc. 14, at 13.)

It is well-recognized that an ALJ must generally give greater deference to the
opinions of a claimant's treating physicians than to non-treating physicians.
Gayheart v. Commissioner, 710 F.3d 365, 375 (6th Cir. 2013); Blakley, 581 F.3d at
406; Wilson, 378 F.3d at 544.  This doctrine, often referred to as the "treating
physician rule," is a reflection of the Social Security Administration's awareness
that physicians who have a long-standing treatment relationship with an individual
are best equipped to provide a complete picture of the individual's health and
treatment history.  Id.; 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2).  The treating
physician doctrine requires opinions from treating physicians to be given controlling
weight where the opinion is (1) "well-supported by medically acceptable clinical and
laboratory diagnostic techniques" and (2) "not inconsistent with the other
substantial evidence in the case record."  Gayheart, 710 F.3d at 376 (citing  20
C.F.R. § 404.1527(c)(2)); Blakley, 581 F.3d at 406; Wilson, 378 F.3d at 544.  In other
words, treating physicians' opinions are only given deference when supported by
objective medical evidence.  Vance v. Commissioner of Social Security, No. 07-5793,
2008 WL 162942, at *3 (6th Cir. Jan. 15, 2008) (citing Jones v. Commissioner, 336
F.3d 469, 477 (6th Cir. 2003)).

Even when a treating source's opinion is not entitled to controlling weight, an
ALJ must still determine how much weight to assign to the opinion by applying

18

specific factors set forth in the governing regulations.  Gayheart, 710 F.3d at 376;
20 C.F.R. §§ 404.1527(c)(1) -(6), 416.927(c)(1)-(6).  Social Security regulations
require the ALJ to give good reasons for discounting evidence of disability
submitted by the treating physician(s).  Blakley, 581 F.3d at 406; Vance, 2008 WL
162942, at *3.  Those good reasons must be supported by evidence in the case
record, and must be sufficiently specific to make clear to subsequent reviewers the
weight assigned to the treating physician's opinion, and the reasons for that weight.
Gayheart, 710 F.3d at 376; Blakley, 581 F.3d at 406-407; Winning v. Commissioner,
661 F.Supp.2d 807, 818-819 (N.D. Ohio 2009) (quoting SSR 96-2p).

Remand may be appropriate when an ALJ fails to provide adequate reasons
explaining the weight he assigned to the treating source's opinions, even though
"substantial evidence otherwise supports the decision of the Commissioner."
Kalmbach v. Comm'r of Soc. Sec., No. 09-2076, 2011 WL 63602, at *8 (6th Cir. Jan.
7, 2011) (quoting Wilson, 378 F.3d at 543-46).

The Commissioner responds that the ALJ reasonably assessed the medical
and functional evidence relating to Bernola's impairments, and fairly
accommodated those impairments with significant restrictions in the RFC
assessment.  (Doc. 17, at 11.)  For example, the ALJ limited Bernola to only work
with SVP levels of 1 to 2, where the pace of productivity was not controlled by any
external source over which Bernola had no control, that was repetitive with
expected changes, and that included no contact with the general public, and only
occasional contact with co-workers.  (Doc. 17, at 11, citing tr., at 23.)

19

The Commissioner argues that:

> While the ALJ discounted some of Dr. Rana's opined limitations, she
> provided good reasons for doing so by explaining that they were
> inconsistent with test results and [Bernola's] daily activities; appeared
> to be based on sympathy rather than objective evidence; partially
> concerned issues reserved to the Commissioner; were internally
> inconsistent and inconsistent with Dr. Rana's own treatment notes;
> and were provided on a confusing form (Tr. 27-29).

(Doc. 17, at 11.)  The Commissioner claims that Bernola's argument largely

amounts to a simple subjective disagreement with the ALJ's weighing of the

divergent medical opinion evidence, which is not a proper basis for reversal where

the ALJ provides good reasons for the weight of the treating source opinion.  Id.

Bernola argues that the ALJ failed to adequately consider Dr. Rana's

opinions and extensive treatment history, and that the weight given to Dr. Rana as

a treating source was not supported by substantial evidence.  (Doc. 14, at 13.)

Bernola points to Dr. Rana's treatment notes for the period from January 2011

through May 2012.  (Doc. 14, at 3-5, 13-15.)

Yet reference to the ALJ's decision demonstrates that the ALJ in fact did

consider the longitudinal treatment record, particularly insofar as it concerned Dr.

Rana's treatment of Bernola.  The ALJ's review of medical evidence begins with a

January 2010 psychological consultative exam with Dr. White.  (Doc. 13, tr., at 25.)

The ALJ then refers to a March 2010 visit, a psychiatric evaluation conducted by

psychiatrist Jatinder Rana, M.D.  (Tr., at 25; see also 476-478.)  The ALJ also

discusses appointments from May 2010, July 2010, and October 2010.  (Tr., at 25.)

All of these visits pre-date the January 2011 – May 2012 period discussed by

20

Bernola (doc. 14, at 13-15), and Dr. Rana was the psychiatrist at all of the cited March to October 2010 visits.  (Tr., at 474-475, 473, 467-468.)  The ALJ also discussed the January 2011 to spring 2012 visits to Dr. Rana.  (Tr., at 25.)

In addition, the ALJ discussed an August 23, 2012, visit to Dr. Rana.  (Tr., at 25, 513-514.)  The record thus demonstrates that not only did Dr. Rana fully consider the longitudinal record of Dr. Rana's treatment of Bernola, but the ALJ's consideration encompassed the period from March 2010 through at least August 2012, a lengthier period than that discussed in Bernola's own brief.

There is substantial evidentiary support in the record for the ALJ's conclusion that Bernola's condition had stabilized.  (Tr., at 29.)  Although it took some adjustments to reach a balance concerning the most effective dosage of certain medications, Dr. Rana's treatment notes indicated that Bernola seemed to be improving (tr., at 493, 513), that she was having fewer hallucinations (tr., at 492, 491, 513), and that she was tolerating her medications well (tr, at 491).  The Commissioner's determination must stand if supported by substantial evidence, regardless of whether substantial evidence also supports the opposite conclusion.

The ALJ provided additional good reasons for the weight given to Dr. Rana's opinion, stating that it was not given "significant weight" because it was inconsistent with the other substantial evidence in the record.  (Tr., at 29.)  To take one example, the ALJ cited Dr. Rana's October 2012 opinion that Bernola would be off-task no more than five percent of the workday, which the ALJ finds to be consistent with the record as a whole.  (Tr., at 29; see also tr., at 517, §5.)  But in

21

that very same report, the ALJ notes the following inconsistency: "However, she later noted that Ms. Bernola is unable to obtain and retain work in a competitive setting eight hours per day, five days per week, which is inconsistent with her prior notation of being off tasks only five percent." (Tr., at 29; see also tr., at 518, § 15.) The ALJ pointed out that this finding [unable to retain work] was also inconsistent with Dr. Rana's own treatment notes. (Tr., at 29.)

The court finds that the ALJ's decision concerning the weight given to Dr. Rana's opinion is supported by good reasons and by substantial evidence in the record.

## B. Procedural Deficiencies

The second issue raised by Bernola is: "Was the ALJ's evaluation of the treating mental health source procedurally deficient so as to leave that determination not supported by the weight of substantial evidence?" Bernola argues that the ALJ's weighing of opinion evidence violated Social Security Rulings 96-6p and 96-2p, and 20 C.F.R. § 416.927, and these procedural deficiencies rendered her mental RFC without the support of substantial evidence. Bernola thus places her focus on the alleged procedural shortcomings of the ALJ's decision. (Doc. 14, at 16.)

The regulation cited by Bernola governs the evaluation of opinion evidence, including how medical opinions are to be weighed. 20 C.F.R. §§ 416.927; 416.927(c). Opinions from treating physicians will generally be given controlling weight, where the opinion is (1) "well-supported by medically acceptable clinical and laboratory

diagnostic techniques" and (2) "not inconsistent with the other substantial evidence in the case record." 20 C.F.R. § 416.927(c)(2).  In other words, treating physicians' opinions are only given deference when supported by objective medical evidence. Vance, 2008 WL 162942, at *3 (citing Jones, 336 F.3d at 477).  Even when a treating source's opinion is not entitled to controlling weight, an ALJ must still determine how much weight to assign to the opinion by applying specific factors set forth in the governing regulations.  Gayheart, 710 F.3d at 376; 20 C.F.R. § 416.927(c)(1)-(6).

Social Security Ruling 96–2p also concerns when treating source medical opinions are entitled to controlling weight.  SSR 96-2p provides that:  "Controlling weight may not be given to a treating source's medical opinion unless the opinion is well- supported by medically acceptable clinical and laboratory diagnostic techniques."  The Ruling also states that:  "Even if a treating source's medical opinion is well- supported, controlling weight may not be given to the opinion unless it also is 'not inconsistent' with the other substantial evidence in the case record." However, if a treating source's medical opinion is well- supported and not inconsistent with the other substantial evidence in the case record, it must be adopted.  SSR 96-2p.

The ALJ is required to give good reasons for discounting evidence of disability submitted by a treating physician.  Blakley, 581 F.3d at 406; Vance, 2008 WL 162942, at *3.  Those good reasons must be supported by evidence in the case record, and must be sufficiently specific to make clear to subsequent reviewers the

23

weight assigned to the opinion, and the reasons for that weight.  Gayheart, 710 F.3d at 376; Blakley, 581 F.3d at 406-407; Winning, 661 F.Supp.2d at 818-819 (quoting SSR 96-2p).  The ALJ found that Dr. Rana's October 2012 opinion was not consistent with other evidence in the record, and gave several reasons in support. (Tr., at 29.)  Reviewing the ALJ's opinion and Bernola's brief, the court cannot discern a procedural violation of SSR 96-2p.

Social Security Ruling 96–6p requires an ALJ to consider opinions given by state agency medical experts when considering disability claims. ALJs are not automatically bound by such medical opinions, but they "may not ignore [them] and must explain the weight given to the opinions in their decisions."  Edwards ex rel. L.T. v. Colvin,  No. 12-C-7639, 2013 WL 3934228, at *4 (N.D. Ill. July 30, 2013) (quoting SSR 96-6p); see also Johnson v. Astrue, No. 1:09CV2959, 2010 WL 5559542, at *5 (N.D. Ohio Dec. 3, 2010) (same).  SSR 96-6p explicitly provides that: "In appropriate circumstances, opinions from State agency medical and psychological consultants and other program physicians and psychologists may be entitled to greater weight than the opinions of treating or examining sources."

Bernola contends that non-examining sources "should only properly outweigh a treating source opinion if they had a more complete record at their disposal in forming their opinions."  (Doc. 14, at 17, citing SSR 96-6p.)  The record is clear that the ALJ considered the various medical opinions at issue, as even Bernola recognizes (doc. 14, at 16-17), and gave reasons for the weight ("some weight") she

assigned to each.  Bernola disagrees with the ALJ's determinations in this regard, but her argument of a procedural error does not have merit.

Bernola complains, for example, that one consultant's opinion, completed in June 2011, lacked access to a year's worth of treatment notes, Dr. Rana's 2012 opinion, and hospital records from December 2011[6].  (Doc. 14, at 18.)  It is not surprising that a consultant conducting a reconsideration of Bernola's claim in June 2011 would not have access to records of events which had not yet occurred. Nevertheless, Section 416.927 provides that the ALJ will consider opinion evidence of non-examining  sources such as medical and psychological consultants.  20 C.F.R. §§ 416.927(e); 416.927(e)(2).  The opinions of these consultants, considered to be experts in Social Security disability evaluation, are evaluated using the relevant factors set forth in Section 416.927(a)-(d).  20 C.F.R. § 416.927(e)(2)(ii).

The ALJ evaluated these psychological and medical consultants' opinions as part of her "careful consideration of the entire record" (tr., at 23), and the court cannot find that she assigned undue weight to their opinions.  The ALJ found that these opinions were "afforded some weight because they had the benefit of Ms. Bernola's longitudinal record and because their opinions are generally consistent with the record as a whole and her routine and conservative treatment."  (Tr., at 28.)

---

[6] The Commissioner points out that this hospital visit related to treatment for a hand injury, and is irrelevant to her mental impairments.  (Doc. 17, at 15 n.3.)

As the Commissioner points out, Bernola's arguments largely amount to a subjective disagreement with the ALJ's weighing of the medical opinion evidence, which is not a proper basis for reversal where the ALJ provides good reasons for the weight of the treating source opinion.  (Doc. 17, at 11-12, citing Mullins v. Secretary, HHS, 836 F.2d 980, 984 (6th Cir. 1987).)  The Commissioner contends that, because substantial evidence supports the ALJ's decision, the court must affirm even if substantial evidence could support a contrary result.  (Doc. 17, at 12, citing Bass v. McMahon, 499 F.3d 506, 509 (6th Cir. 2007).)

Bernola makes extensive arguments such as how the ALJ allegedly "failed to properly acknowledge" the significance of certain evidence (doc. 14, at 18), or "mischaracterized" Dr. Rana's treatment (doc. 14, at 20).  Bernola contends that the ALJ's "attempts at evaluating and weighing the opinion evidence relevant to this claim were procedurally erroneous and not supported by substantial evidence." (Doc. 18, at 4.)  In fact, it is the ALJ's conclusions that Bernola attacks, and not any procedural deficiencies per se.

For example, Bernola points out that the ALJ assigned "great weight" to Dr. Rana's marked limitation in social interaction.  (Doc. 14, at 19.)  Dr. Rana indicated that Bernola was "markedly limited" in the ability to get along with coworkers without distracting them or exhibiting behavioral extremes, and in the ability to maintain socially appropriate behavior.  (Doc. 14, at 19, citing tr., at 461.)  The ALJ determined that Bernola's RFC included "no contact with the general public; and occasional contact with coworkers."  (Tr., at 23.)  Bernola believes that Dr. Rana's

26

opinion "should reasonably raise doubts about [her] capacity for even occasional contact," and thus the RFC should be found unsupported and erroneous.  (Doc. 14, at 19.)  Bernola's disagreement with the ALJ's conclusion does not amount to a procedural error.

Similarly, Bernola contests the ALJ's statement that she was "stable on medications."  (Doc. 14, at 20; tr., at 29.)  Bernola would rather characterize the situation as "periods of relative stability."  (Doc. 14, at 20.)  She argues that these periods were accomplished through trial and error with medications that prompted the undesirable side effect of hand tremors.  (Doc. 14, at 20; doc. 18, at 3-4.)  In finding Bernola to be "stable,"  the ALJ relied on the most recent of Dr. Rana's treatment notes in the record:  "she was not paranoid and things were under control."  (Tr., at 25; see generally tr., at 513-514, August 2012.)  The ALJ's discussion of the medical evidence recognizes the trial-and-error nature of Dr. Rana's treatment, attempting in particular to balance the proper dosage against the side effects.  (Tr., at 25, noting that decreases in Invega were unsuccessful.)  The ALJ's finding on this issue is supported by substantial evidence in the record, as detailed in the court's recitation of the medical evidence earlier (Section III above).  Bernola's disagreement with the ALJ's conclusion does not amount to a procedural error.

SUMMARY

For the foregoing reasons, the court finds that the decision of the Commissioner is supported by substantial evidence.

In summary, the ALJ has the responsibility for reviewing all the evidence in making her determinations. 20 C.F.R. § 416.927(e)(2). The ALJ evaluates every medical opinion received in evidence. 20 C.F.R. § 416.927(c). The ALJ will consider any statements that have been provided by medical sources, whether or not based on formal medical examinations. 20 C.F.R. § 416.945(a)(3). Although the ALJ reviews and considers all the evidence before her, the responsibility for assessing the claimant's residual functional capacity rests with the ALJ. 20 C.F.R. § 416.946(c). Here, the ALJ's findings were supported by relevant evidence and consistent with the record as a whole. The court finds that the ALJ's decision is based on substantial evidence in the record, as outlined in her findings and supported by medical evidence.

The record evidence as discussed in the ALJ's decision is such that a reasonable mind might accept it as adequate support for the Commissioner's final benefits determination. The decision of the ALJ should be affirmed.

RECOMMENDATION

For the foregoing reasons, the Magistrate Judge finds that the decision of the Commissioner is supported by substantial evidence.  Accordingly, the undersigned recommends that the decision of the Commissioner be **AFFIRMED**.


s/ Kenneth S. McHargh
Kenneth S. McHargh
United States Magistrate Judge


Date:  Aug. 6, 2015

ANY OBJECTIONS to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days of mailing of this notice.  Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation.  *See Thomas v. Arn*, 474 U.S. 140 (1985); *see also United States v. Walter*s, 638 F.2d 947 (6th Cir. 1981).